**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____ :
                                    :
ALVIN RICH,                         :
                                    :
               Plaintiff,   :   Civil Action No. 16-1895 (FLW) (DEA)
                                    :
      v.                :
                                    :   **OPINION**
VERIZON NEW JERSEY INC.,            :
                                    :
             Defendant.   :
_____ :

**<u>WOLFSON, United States District Judge</u>:**

      Defendant Verizon New Jersey Inc. ("Defendant" or "Verizon") moves for summary judgment of Plaintiff Alvin Rich's ("Plaintiff") Complaint, which asserts claims against Verizon for disability discrimination, in violation of the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, *et seq.* ("NJLAD"), and for racial discrimination, in violation of the NJLAD. Plaintiff is a former employee of Verizon, having worked as Outside Plant Technician ("OPT") 2008 or 2009 until 2014, when he was fired for falsifying answers on a medical examination form. In 2010, while employed as an OPT, Plaintiff was diagnosed with cardiomyopathy and had a defibrillator implanted in his chest. Following his termination, Plaintiff brought suit under the ADA and the NJLAD, alleging that Verizon failed to accommodate his disability, and, ultimately, discharged him as a result of his disability. Plaintiff further alleged that Verizon discriminated against him on the basis of race, by failing to offer Plaintiff an accommodation that Verizon had previously offered a non-minority employee. For the reasons that follow, Verizon's Motion for Summary Judgment is GRANTED.

1

## I.     FACTUAL BACKGROUND[1]

### A.     Plaintiff's Position as an OPT

Plaintiff began working for Verizon in 1997. Defendant's Statement of Undisputed Facts ("Def.'s Statement"), ¶ 1; Plaintiff's Response to Defendant's Statement of Undisputed Facts ("Pl.'s Resp."), ¶ 1. At some point in 2008 or 2009, Plaintiff began working as an OPT for Verizon. Def.'s Statement at ¶ 2; Pl.'s Resp. at ¶ 2. As an OPT, Plaintiff was responsible for "the installation and maintenance of Verizon's cabling infrastructure and telephone poles." Deposition Transcript of Jamie LaMarsh ("LaMarsh Dep."), 10:2-14; Def.'s Statement at ¶ 4; Pl.'s Resp. at ¶ 4.

While the parties do not dispute that the OPT position is among the most strenuous jobs at Verizon, because it requires an employee to perform safety sensitive and physically demanding work, Def.'s Statement at ¶ 5; Pl.'s Resp. at ¶ 5, they offer divergent accounts of the job functions of an OPT. At the outset, Verizon's written job description for the OPT position (the "OPT Job Description") provides, in relevant part, as follows:

### Summary

Performs work associated with the installation, removal of rearrangement of outside plant facilities. Connecting wires and cables to terminals and attaching or detaching various kinds of hardware to wires, cables, buildings or poles. Keeps reports and records and performs other duties as may be assigned. May be assigned to other work locations as needed.

### General Duties

Duties may include, but are not limited to, the following:

    . . .

---

[1] The following facts are undisputed, except where noted, and are viewed in the light most favorable to Plaintiff, the non-moving party on this Motion for Summary Judgment.

B. Placing, rearranging and removing outside telephone plant, including aerial, underground, submarine, buried, block and house cables, poles, and associated hardware fixtures and equipment. Trimming trees may also be required.

C. Connecting wires and cables to terminals and attaching or detaching various kinds of hardware to wires, cables, buildings or poles. Placing various terminals and/or cabinets, as required.

D. Inspecting, repairing and maintaining wire and cables and poles.

E. Operating construction type equipment, such as winches, chain saws, hydraulic aerial lifts, and using large hand tools in placing wires and related materials.

F. Works aloft; climbs ladders and poles; enter tunnels, buildings, trenches, crawl spaces, manholes, and other confined spaces to accomplish job tasks.

. . .

H. Digging holes, placing poles, laying cable and conduit in the ground, unrolling cable, placing fiber interduct and pulling and stringing wire and cable from pole to pole.

. . .

J. Operating Company motor vehicles of varying gross weights which may be used to tow auxiliary equipment and supplies such as, poles, cable reels, generator pumps, etc. in a safe manner.

. . .

N. Works outside in all weather conditions.

O. Recognize and take proper precautions when working near any hazardous materials.

. . .

## Basic Qualifications

. . .

C. Must be able to perform physical requirements of the job, with or without a reasonable accommodation, including, but not limited to, perceiving differences in wire cable colors, moving and/or lifting items such as ladders, tools, air tanks, cable reels, test equipment and other objects weighing up to 100 pounds, working aloft; climbing ladders and poles,

and entering tunnels, buildings, trenches, crawl spaces, manholes, and other confined spaces to accomplish job tasks.

. . .

E. A valid state driver's license is required. Must have ability to drive vehicle with manual gearshift. Where a Commercial Driver's License is required, the applicant must pass an alcohol and drug test.

a. Must meet applicable federal and state standards for operating the size vehicles covered by this job title.

b. A Commercial Driver's License, CLASS A (CDL-A) or CLASS B (CDL-B) is required. To obtain the CDL-A or CDL-B license, the employee/applicant must qualify on the Department of Transportation's CDL license physical, written, and skills qualifications tests. If applicant does not have a valid CDL license at the time of hire, he/she will be required to obtain such license within six months of hire date.

OPT Job Description (the "OPT Job Description"), Declaration of Jamie LaMarsh ("LaMarsh Decl."), Ex. A.

Initially, the Court notes that the parties do not dispute that Verizon's OPT Job Description requires an employee to maintain a Commercial Driver's License ("CDL"). Def.'s Statement at ¶ 13; Pl.'s Resp. at ¶ 13. However, while Verizon maintains that an individual cannot perform the job functions of an OPT without holding a CDL, Def.'s Statement at ¶¶ 6, 13, Plaintiff argues that he can perform, and previously had performed, the functions of an OPT without holding a CDL. Pl.'s Resp. at ¶ 6. Specifically, Plaintiff testified that he can perform the duties of an OPT by either driving a "light-placer truck," which does not require a CDL, or by riding as a passenger when a CDL-rated truck is required, as Plaintiff had often done in the past. Deposition Transcript of Alvin Rich ("Rich Dep."), 50:4-21; Pl.'s Resp. at ¶¶ 6, 12-14. Plaintiff further asserts that, in practice, Verizon had allowed prior employees, including Plaintiff, to work as an OPT without possessing a CDL. Rich Dep. 58:1-59:10; Pl.'s Resp. at ¶¶ 13-14. To that end, Plaintiff testified that he did not get a CDL for approximately a year and a

4

half after he started working as an OPT, Rich Dep. 58:1-59:10, and that, from July 2013 to December 2013, after he lost his CDL, he performed all of the duties of an OPT, with the exception of those that required a CDL. Rich Dep. 50:4-21.

With respect to the other job functions of an OPT, Plaintiff does not dispute that the OPT position required him to work aloft, including, on occasion, to climb ladders ranging from six to twenty-eight feet. Def.'s Statement at ¶¶ 7-8; Pl.'s Resp. at ¶¶ 7-8. Plaintiff further admits that the OPT position required him to descend into manholes, and to operate construction equipment, including winches, aerial lifts, and chainsaws. Def.'s Statement at ¶¶ 9-10; Pl.'s Resp. at ¶¶ 9-10. Plaintiff also testified that, as an OPT, he "sometimes" had to work in close proximity to electric poles. Rich Dep. 14:15-22.

### B.  Plaintiff's Heart Condition and Treatment History

After demonstrating an irregular heartbeat during a 2010 endoscopy, Plaintiff began treatment with Subhashini Gowda, M.D., a cardiologist with a specialty in Electophysiology.[2] Def.'s Statement at ¶¶ 16-17; Pl.'s Resp. at ¶¶ 16-17. Dr. Gowda diagnosed Plaintiff with congestive heart failure, hypertension, systolic heart failure, and cardiomyopathy. Def.'s Statement at ¶ 18; Pl.'s Resp. at ¶ 18. Specifically, Dr. Gowda diagnosed Plaintiff's cardiomyopathy as "dilated," which meant that Plaintiff had a weak heart pump that was "blown out" or "thinned out." Gowda Dep. 17:11-18:22; Def.'s Statement at ¶ 19; Pl.'s Resp. at ¶ 19. Dr. Gowda also diagnosed Plaintiff's cardiomyopathy as "severe," noting that a patient has cardiomyopathy if his or her heart pumps at less than 50%, and explaining that, in 2010, Plaintiff's heart pumped at "an extremely weak . . . 15 percent." Gowda Dep. 18:3-16, 34:14-16;

---

[2] Dr. Gowda testified that Electrophysiology is a "super specialty of cardiology." Deposition Transcript of Subhashini Gowda, M.D. ("Gowda Dep."), 9:13-18.

Def.'s Statement at ¶ 19; Pl.'s Resp. at ¶ 19. Dr. Gowda characterized Plaintiff's cardiomyopathy alternatively as a "heart disease," an "illness," and a "heart condition." Gowda Dep. 55:24-56:4, 87:16-24, 92:18-25; Def.'s Statement at ¶ 20; Pl.'s Resp. at ¶ 20.

In addition to prescribing Plaintiff medication for his various heart conditions, on November 15, 2010, Dr. Gowda installed an implantable cardio defibrillator ("ICD") in Plaintiff's chest. Def.'s Statement at ¶¶ 22-23 Pl.'s Resp. at ¶ 22-23. During his deposition, Dr. Gowda described the ICD as follows:

> It's a machine that gets inserted in the chest wall with wires into the heart and, basically, what it does, it does several things. But the most important thing it does, it monitors the heartbeat. And if the heartbeat were to go very fast, it shocks the heart. It's like one of those automatic defibrillators you find in the airport or you have seen in the television series where the patients collapse, it shocks and brings them back to life. And it can also, if the heart goes too slow, it can act as a pacemaker and make the heart beat.

Gowda Dep. 19:1-15; Def.'s Statement at ¶ 22; Pl.'s Resp. at ¶ 22. To implant the ICD, Dr. Gowda performed the following procedure:

> Anesthesia is administered . . . its called a moderate sedation rather than having to use full general anesthesia . . . . A small incision is done underneath the shoulder or the clavicle, clavicle bone . . . after the incision is done, we get access to the central venous circulating system of the heart and we put in two wires into the heart and the wires are then connected to a defibrillator and the defibrillator makes the heart pump either slow or fast and, then, its closed up; the incision is then closed . . . [the wires are attached to] the heart, the muscle from inside. One of them is on the outside, two of them are on the inside of the heart.

Gowda Dep. 22:7-23:6; Def.'s Statement at ¶ 24; Pl.'s Resp. at ¶ 24.

During her deposition, Dr. Gowda was presented conflicting testimony as to whether the insertion of an ICD is considered a "surgery" or a "procedure." Initially, Dr. Gowda testified that, because implanting an ICD requires the doctor to slice through skin using a scalpel, it is considered a "surgery." Gowda Dep. 23:7-25:4. Dr. Gowda further testified that implanting an ICD is "not like how you do an open heart bypass or a valve repair, but it is considered [a]

smaller, much smaller procedure . . . ." Gowda Dep. 23:16-19. Nonetheless, Dr. Gowda

subsequently testified that, although the insertion of an ICD "may be considered a minor

surgery," or a "small surgery," it is a "procedure," and is "typically considered a procedure."

Gowda Dep. 47:14-49:7. Dr. Gowda also testified that it was possible that, during her

consultation with Plaintiff prior to the insertion of the ICD, she described implanting an ICD as a

procedure. Gowda Dep. 49:8-17. When asked whether it was possible that she "never

mentioned the word 'surgery' to either [Plaintiff] or his wife," Dr. Gowda responded, "No. It

was very clear the details of the procedure or the minor surgery, whatever it is. It was very

clear." Gowda Dep. 49:18-25.

Plaintiff testified that, after the ICD was implanted, he was out of work for approximately

two months. Rich Dep. 31:8-10. He further testified that the procedure left a "small scar" on the

upper left side of his chest. Rich. Dep. 31:21-32:1.

### C.    DOT Medical Examinations

Following Plaintiff's return to work, Plaintiff underwent a series of Department of

Transportation ("DOT") medical examinations, as required to maintain his CDL. Def.'s

Statement at ¶ 29; Pl.'s Resp. at ¶ 29. During each of his DOT medical examinations, Plaintiff

completed reports, titled "Medical Examination Report For Commercial Driver Fitness

Determination," which required him to answer various questions pertaining to his health history.

The first such examination after Plaintiff's return to work occurred on May 24, 2012 (the

"2012 Examination"). Def.'s Statement at ¶ 29; Pl.'s Resp. at ¶ 29. During the 2012

Examination, Plaintiff answered "No" to the following three questions on the DOT Medical

Examination Report (the "2012 Report"): (1) Any illness or injury in the last five years?; (2)

Heart disease or heart attack; other cardiovascular condition; and (3) Heart surgery (valve

replacement/bypass, angioplasty, pacemaker). 2012 Medical Examination Report, Def.'s Mot. for Summ. J., Ex. 5; Def.'s Statement at ¶ 30; Pl.'s Resp. at ¶ 30. Additionally, despite the fact that he was taking mediation for his heart condition at the time, Plaintiff did not list any medications on the 2012 Report. Rich Dep. 40:5-20; Def.'s Statement at ¶ 31; Pl.'s Resp. at ¶ 31. Plaintiff signed the 2012 Report, certifying that the information provided was "complete and true," and that he understood "that inaccurate, false or missing information may invalidate the examination." 2012 Medical Examination Report; Def.'s Statement at ¶ 32; Pl.'s Resp. at ¶ 32. Plaintiff testified that he checked, "No" to the three questions on the 2012 Report because he felt that he was "healthy" and "didn't have anything wrong with [him]," and that "these checks just came off quickly and, you know, not really taking time to sit there and evaluate." Rich Dep. 39:3-25. Plaintiff further testified that he did not list his medications on the 2012 Report because he "couldn't remember the medication off the top of [his] head and [he] didn't want to put down the wrong medication." Rich Dep. 40:5-20.

Plaintiff's next DOT medical examination occurred on July 16, 2013 (the "2013 Examination"), where Plaintiff again filled out a DOT Medical Examination Report (the "2013 Report"). Def.'s Statement at ¶ 34; Pl.'s Resp. at ¶ 34. In the 2013 Report, Plaintiff again certified "No" to the following three questions: (1) Any illness or injury in the last five years?; (2) Heart disease or heart attack; other cardiovascular condition; and (3) Heart surgery (valve replacement/bypass, angioplasty, pacemaker). 2013 Medical Examination Report, Def.'s Mot. for Summ. J., Ex. 5; Def.'s Statement at ¶¶ 35-36; Pl.'s Resp. at ¶¶ 35-36. During the course of the 2013 Examination, a medical examiner noticed the scar on Plaintiff's chest, and asked Plaintiff whether he had a pacemaker. Rich Dep. 44:20-46:2; Def.'s Statement at ¶ 37; Pl.'s Statement at ¶ 37. Plaintiff responded that the scar was the result of having the ICD implanted,

not a pacemaker.  Rich Dep. 45:1-46:2; Def.'s Statement at ¶ 37; Pl.'s Resp. at ¶ 37.  The

examiner then informed Plaintiff that, under the DOT regulations, his ICD disqualified him from

obtaining a CDL.[3]  Def.'s Statement at ¶ 38; Pl.'s Resp. at ¶ 38.

  **D.**  **Verizon's Disability Discrimination Policy**

  Verizon has written policies pertaining to unlawful discrimination, including disability

discrimination.  Def.'s Statement at ¶ 39; Pl.'s Resp. at ¶ 39.  In 2012, Verizon and the

International Brotherhood of Electrical Workers, AFL-CIO (the "Union") collectively-bargained

for, and agreed to, the Medical Restriction Leave Policy Amendment ("MR-LOAPA") as an

amendment to a prior policy that the parties had agreed to in 1998 (the "MR Policy").  Def.'s

Statement at ¶ 40; Pl.'s Resp. at ¶ 40.  Under the MR-LOAPA, Verizon is contractually obligated

to provide medically restricted employees, whose restriction prevents them from performing an

essential function of their position with or without accommodation, with work that can be

performed within their medical restrictions for up to 150 days.  Def.'s Statement at ¶ 41; Pl.'s

Resp. at ¶ 41.  During those 150 days, medical restricted employees receive full pay and benefits.

Def.'s Statement at ¶ 41; Pl.'s Resp. at ¶ 41.

  The MR-LOAPA further provides that, if the medically restricted employee's restriction

exceeds 30 days, Verizon will begin to look for available positions, of equivalent or lower job

classification to the employee's prior position, that the employee is medically qualified and test

qualified to perform, with or without a reasonable accommodation.  Def.'s Statement at ¶ 42;

---

[3] Plaintiff testified that, prior to informing him that his ICD disqualified him from maintaining a
CDL, the examiner first attempted to get Plaintiff to state that he had a pacemaker, rather than an
ICD.  Rich Dep. 45:13-25.  Specifically, Plaintiff testified that the examiner attempted to "lead
[him]" into answering that he had a pacemaker, rather than an ICD, "because she said -- her
exact words, I believe, at that time, well not exact words, she said, 'A pacemaker is not a DOT
disqualification. A defibrillator is. Are you sure it's not a pacemaker?'"  Rich. Dep. 45:19-25.

Pl.'s Resp. at ¶ 42.  Medically restricted employees are entitled to priority placement in any such position.  Def.'s Statement at ¶ 42; Pl.'s Resp. at ¶ 42.  Medically restricted employees may also apply directly for vacant positions for which they are qualified that would amount to a promotion.  Def.'s Statement at ¶ 43; Pl.'s Resp. at ¶ 43.

Upon the expiration of the 150-day period, if the employee remains unable to perform his or her prior job with or without reasonable accommodation, and if Verizon has not identified a suitable vacancy for priority-placement, Verizon places the employee on unpaid leave with benefits.  Def.'s Statement at ¶ 44; Pl.'s Resp. at ¶ 44.  Under the MR-LOAPA, the total period of this accommodation (the 150-day period plus the unpaid leave period) is 52 weeks (or, in appropriate circumstances, a finite period beyond that as a reasonable accommodation).  Def.'s Statement at ¶ 44; Pl.'s Resp. at ¶ 44.  Verizon's Workplace Accommodations Team is responsible for administering Verizon's contractual obligations to its employees under the MR-LOAPA, as well as Verizon's other disability discrimination policies.  Def.'s Statement at ¶ 45; Pl.'s Resp. at ¶ 45.

### E.    Verizon's Handling of Plaintiff's Medical Restrictions

On August 27, 2013, Verizon sent Plaintiff a letter indicating that, as a result of Plaintiff's ICD and heart disease, Plaintiff was unable to perform the essential functions of the OPT position, and thus, that, effective July 26, 2013, Plaintiff was covered under the Mid-Atlantic Medically Restricted Plan ("MRP"),[4] thereby commencing the 150-day period outlined in the MR-LOAPA.  Def.'s Statement at ¶ 46; Pl.'s Resp. at ¶ 46.

---

[4] The MRP incorporates the terms of the MR-LOAPA and the MR Policy.  Def.'s Statement at ¶ 46; Pl.'s Resp. at ¶ 46.

The parties dispute both the extent to which Plaintiff's supervisor, Jamie LaMarsh, was aware of Plaintiff's medical restrictions following the 2013 Examination, as well as Mr. LaMarsh's handling of Plaintiff's medical restrictions during that time. Verizon claims that "[t]he only information that Mr. LaMarsh received regarding Plaintiff's condition was that he did not pass his DOT exam." Def.'s Statement at ¶ 47. However, Mr. LaMarsh testified that, immediately following the 2013 Examination, Plaintiff informed Mr. LaMarsh that he had "failed because he has a pacemaker," and that he was "going to contact his doctor to try and rectify the discrepancy between his doctor and . . . the doctor that performed the DOT exam." LaMarsh Dep. 21:11-22:20. Mr. LaMarsh further testified that, after receiving notification of Plaintiff's failed DOT examination, he directed Plaintiff to "go back to the garage" to do "[c]omputer-based training." LaMarsh Dep. 22:13-23-7. Defendant further claims that, following Plaintiff's failed examination, Mr. LaMarsh assigned Plaintiff to computer-based training, and only "sent Plaintiff out into the field to perform non-safety sensitive functions that were consistent with his medical restrictions." Def.'s Statement at ¶ 50.

Plaintiff offers a different version of his interactions with Mr. LaMarsh following his failure to pass the 2013 Examination. To that end, Plaintiff testified that, after failing the examination, he informed Mr. LaMarsh that he "had a defibrillator and I'm disqualified and they are not going to issue a DOT card." Rich Dep. 49:13-25. Plaintiff testified that Mr. LaMarsh responded by saying, "Don't worry about it. You can still perform your job, so don't worry about it. Just let another guy drive and you'll be okay." Rich Dep. 50:1-7. Plaintiff also disputes Defendant's assertion that Plaintiff was restricted to computer-based training and non-safety sensitive field work following the 2013 Examination. In that regard, Plaintiff testified that, following the 2013 Examination, in addition to performing computer-based training, he was

assigned to the "[s]ame exact work that [he had] been doing," except that Mr. LaMarsh informed Plaintiff "that [he] couldn't drive. He said, 'If you're going to drive, take a light placer.' He said, you know, 'If you're in a line truck, you can't drive. Just business as usual.'" Rich Dep. 50:16-21. Indeed, Mr. LaMarsh testified that, on August 1, 2013, after learning of Plaintiff's failed examination, he sent email correspondence to Anthony DiVito, Mr. LaMarsh's Human Resource Business Partner, advising Mr. DeVito that "[LaMarsh had] a light placer [vehicle] that [Plaintiff] can drive, he just can't drive a DOT-rated vehicle" and that "[LaMarsh had Plaintiff] doing line work[5] but only as a passenger, not a driver." LaMarsh Dep. 37:19-39:4. Mr. LaMarsh further testified that, as Plaintiff's supervisor, he did not "have a problem" with Plaintiff performing his prior work by being allowed to drive a light placer vehicle instead of a vehicle requiring a CDL, but that his suggestion to Mr. DiVito that Plaintiff could operate a light placer was merely a recommendation, and that he lacked authority to make the ultimate decision of whether Plaintiff could perform his prior work as an OPT. LaMarsh Dep. 39:23-40:19.

In October of 2013, Verizon requested that Brian Morris, M.D., -- the Medical Director for AllOne Health, which served as Verizon's independent, third-party medical provider, -- conduct a review of the 2013 Examination and Verizon's OPT Job Description to determine Plaintiff's workplace medical restrictions. Def.'s Statement at ¶ 51; Pl.'s Resp. at ¶ 51. Based on his prior experience, Dr. Morris was aware that Plaintiff's ICD disqualified him from holding a CDL. Def.'s Statement at ¶ 52; Pl.'s Resp. at ¶ 52. Following his review, Dr. Morris imposed the following additional restrictions on Plaintiff: "No driving company vehicles; No work at

---

[5] Mr. LaMarsh testified that line was not a specific type of work, but rather, "could be anything," including spotting another employee for safety purpose. LaMarsh Dep. 39:9-16.

heights; No safety-sensitive work; No work with or around dangerous machinery; No confined space entry without a partner present."[6]  Def.'s Statement at ¶ 53; Pl.'s Resp. at ¶ 53.

On December 6, 2013, Verizon sent Plaintiff a letter informing him that he would reach 150 days on the MRP on December 22, 2013.  Def.'s Statement at ¶ 54; Pl.'s Resp. at ¶ 54.  On December 11, 2013, Mr. LaMarsh sent Plaintiff a letter notifying him that, effective December 12, 2013, Plaintiff was being transferred to a Verizon call center.  Def.'s Statement at ¶ 55; Pl.'s Resp. at ¶ 55.  On December 17, 2013, Plaintiff filed a Workplace Accommodation Request Form (the "Accommodation Request"), wherein he submitted the following request:

> I am requesting that I be allowed to utilize a light placer vehicle in place of a CDL-rated vehicle.  I recently completed a trial accommodation, from July 25th 2013 until December 5th 2013.  During this time I continued to work out in the field performing all the job functions of an outside plant technician.  During this time I set poles, transferred cables, and placed cables, and drove a light placer vehicle, which does not require a CDL license.  I was able to perform all essential job functions at no additional cost to the company.  I am requesting to continue to utilize a light placer vehicle as a permanent accommodation.

> Utilizing the light placer vehicle will allow me to transport myself to and from each worksite.  . . . All One Health has determined that I should not drive a CDL rated vehicle.  Once at the worksite I can perform all functions of my job.  The accommodation is only needed to get to and from each worksite.

---

[6] Defendant cites Dr. Morris' testimony that he imposed these restrictions as a result of the fact that "the [ICD] could go off at any time in response to a cardiac event, and given that firing of the [ICD] would be associated with a change of consciousness."  Def.'s Statement at ¶ 53 (quoting Declaration of Brian Morris, M.D. ("Morris Decl."), Def.'s Mot. for Summ. J., Ex. 9).  Plaintiff disputes Dr. Morris' testimony that the firing of the ICD would necessarily be associated with a change of consciousness, citing to Dr. Gowda's testimony that, in addition to firing in response to a person losing consciousness, an ICD may fire if a person has "palpitations or feel[s] miserable," or "prevent the patient from dying or losing consciousness," and that an ICD is supposed to help a person "regain consciousness and/or proper heart function."  Gowda Dep. 32:23-33:18.

Pl.'s Accommodation Request, Def.'s Mot. for Summ. J., Ex. 11; Def.'s Statement at ¶ 56; Pl.'s Resp. at ¶ 56. Verizon denied Plaintiff's accommodation request. Def.'s Statement at ¶ 57; Pl.'s Resp. at ¶ 57.

In accordance with the MR-LOAPA, while Plaintiff was on the MRP, Verizon searched for alternative positions that Plaintiff could perform, and notified Plaintiff of open positions as a Fiber Customer Support Analyst, Operations Clerk, Repair Service Clerk, and Network Technician. Def.'s Statement at ¶ 58; Pl.'s Resp. at ¶ 58. Plaintiff failed to test qualify for any of the open positions identified by Verizon. Def.'s Statement at ¶ 58; Pl.'s Resp. at ¶ 58.

On December 20, 2013, Verizon notified Plaintiff that his 150-day period on MRP was set to expire on December 22, 2013, and that, because Plaintiff had not recovered or been cleared to perform the essential functions of his OPT position or found an alternative position, Plaintiff would be placed on unpaid leave with benefits. Def.'s Statement at ¶ 60; Pl.'s Resp. at ¶ 60. During the period of unpaid leave with benefits, Plaintiff did not look for work outside of Verizon. Def.'s Statement at ¶ 61; Pl.'s Resp. at ¶ 61. Mr. LaMarsh ceased being Plaintiff's supervisor at the end of 2013. Def.'s Statement at ¶ 62; Pl.'s Resp. at ¶ 62.

On approximately February 28, 2014, Dr. Morris spoke with Dr. Gowda regarding Plaintiff's conditions and workplace restrictions. Def.'s Statement at ¶ 63; Pl.'s Resp. at ¶ 63. During the course of their conversation, Dr. Gowda advised Dr. Morris that Plaintiff had severe dilated cardiomyopathy and an ICD that had never fired, but that Plaintiff had been getting better over the years, and that Plaintiff's ejection fraction had moved from 20 percent to 42%. Def.'s Statement at ¶ 63; Pl.'s Resp. at ¶ 63.

The parties dispute whether Dr. Gowda agreed with the restrictions that Dr. Morris had imposed on Plaintiff, and as to whether those restrictions needed to be imposed indefinitely.

Def.'s Statement at ¶ 64; Pl.'s Resp. at ¶ 64. Nonetheless, after reviewing the OPT Job Description during her deposition, Dr. Gowda testified that a person with Plaintiff's medical history could not perform that type of job. Gowda Dep. 42:12-44:2; Def.'s Statement at ¶ 65; Pl.'s Resp. at ¶ 65. Dr. Gowda further testified that, although Plaintiff has no restrictions in terms of driving his own car, he cannot operate commercial vehicles, including a "commercial [vehicle] or heavy equipment or [a] truck or machinery." Gowda Dep. 58:1-21; Def.'s Statement at ¶ 66; Pl.'s Resp. at ¶ 66.

### F. Plaintiff's Termination

After discovering Plaintiff's ICD and heart disease, and reviewing Plaintiff's responses to the health history questions on his DOT medical examination forms, Verizon Security conducted an investigation to determine whether Plaintiff's answers violated Verizon's Code of Conduct. Def.'s Statement at ¶ 69; Pl.'s Resp. at ¶ 69. The Verizon Code of Conduct provides, in relevant part:

**Sustain a Culture of Integrity**

This Code of Conduct is a statement of the principles and expectations that guide ethical business conduct at Verizon. Verizon requires all employees to use their judgment, to be accountable for their actions and to conduct business with integrity.

**3.1.1 Creating Accurate Records**

You must create accurate records that reflect the true nature of the transactions and activities that they record (including, but not limited to, reporting of time, documenting attendance and absence, productivity, commissioners, and quality assurance). You must resolve discrepancies in any records and make appropriate corrections. If you suspect or learn that records are misleading or contain errors, you must promptly inform either your supervisor or the VZ Compliance Guideline and, if applicable, customers and business providers. Because even a minor error can affect the truthfulness of a record, you must report all errors, regardless of their size or how long ago they may have occurred. If your supervisor fails to address a report about a record's accuracy, you must report your concern to Internal Audit or the VZ Compliance Guideline.

Verizon does not tolerate falsification or improper alteration of records. If is never appropriate to direct someone else to prepare or approve a false or misleading record and it is no defense to say that someone else directed you to make a record that you knew or had reason to suspect was false or misleading. It is also improper to intentionally take any action that leads to the creation of false or misleading records, such as withholding information from, or providing incomplete information to, someone who is preparing a record. If you believe that a record was intentionally falsified or created to be misleading, you must contact Internal Audit or the VZ Compliance Guideline.

Declaration of Erik Sheehan ("Sheehan Decl."), Def.'s Mot. for Summ. J., Ex. 4; Def.'s Statement at ¶ 71; Pl.'s Resp. at ¶ 71. Plaintiff was aware of Verizon's Code of Conduct and had received training in it, including Verizon's requirement that all employees act with honesty and integrity, and that the Code of Conduct prohibited employees from falsifying records.[7] Def.'s Statement at ¶¶ 73-74; Pl.'s Resp. at ¶¶ 73-74.

Verizon's investigation culminated in an Investigative Report, dated April 11, 2014, wherein Verizon concluded that Plaintiff "knowingly provided false and misleading information on his 2012 and 2013 Medical Examination Reports (collectively, the "Examination Reports"), concealing that he had an implanted defibrillator, which disqualified him from retaining his [CDL]." Investigative Report (the "Investigative Report"), Def.'s Mot. for Summ. J., Ex. 17; Def.'s Statement at ¶ 76; Pl.'s Resp. at ¶ 76. Verizon determined that Plaintiff's actions violated Section 3.1.1 of the Code of Conduct. *See* Investigative Report.

On May 7, 2014, while Plaintiff was on unpaid leave, Verizon sent Plaintiff a letter, notifying him that, as a result of Verizon's determination that Plaintiff had violated its Code of Conduct by "knowingly provid[ing] false and misleading information on [his] 2012 and 2013 Medical Examination Records, concealing that [he] had a cardiovascular condition and an

---

[7] The parties dispute whether Verizon "routinely" terminates its employees for providing false information to the company and/or falsifying records. Def.'s Statement at ¶ 72; Pl.'s Resp. at ¶ 72.

[ICD]," Verizon was terminating Plaintiff from his employment as an OPT. *See* Investigative Report; Def.'s Statement at ¶ 77; Pl.'s Resp. at ¶ 77.

### G. Racial Tension at Verizon

Plaintiff alleges a series of incidents that demonstrate racial tension at the Verizon garage location from which he worked. The first of those incidents occurred in 2008, before Plaintiff began working in that garage, when the Robbinsville Township Police Department was called to investigate a noose that was displayed in the garage. Plaintiff's Counterstatement of Material Facts ("Pl.'s Counterstatement"), ¶¶ 13-14. Douglas L. Walters, Chief Steward for the Union, testified that he was aware of this incident, and that there was "a sign attached to the noose that depicted words that were derogatory toward the black race." Affidavit of Douglas L. Walters ("Walters Aff."), ¶¶ 30-31. Nonetheless, Mr. Walters testified that, by the time he arrived to the scene, "the noose was still in place but the sign depicting racial discrimination had been removed." Walters Aff. ¶ 33.

Plaintiff also testified that, in 2011, an African-American Verizon employee relayed to Plaintiff that the employee had found racially charged threats written inside of his truck. Rich Dep. 85:10-86:9; Pl.'s Counterstatement at ¶ 21. Specifically, Plaintiff testified that someone had written "I'm going to kill you 'F' word and 'N' word all through the truck." Rich Dep. 85:10-85:20.

## II. PROCEDURAL HISTORY

On September 17, 2015, Plaintiff filed this action in the Superior Court of New Jersey, Law Division, Middlesex County. Plaintiff filed an amended complaint in state court on February 25, 2016, naming Verizon NJ as the sole defendant, and asserting claims for: (1) failure to accommodate Plaintiff's disability, in violation of the NJLAD; and (2) racial

discrimination, in violation of the NJLAD.  On April 5, 2016, Verizon removed the action to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.[8]

On January 6, 2017, Plaintiff filed his Second Amended Complaint, asserting claims against Defendant under the NJLAD and the ADA.  Second Am. Compl., ECF No. 20.  Count One of the Second Amended Complaint alleges that Defendant committed disability discrimination, in violation of the NJLAD, by failing to engage in the interactive process and to "reasonably accommodate" Plaintiff's disabilities, and by terminating Plaintiff as a result of disabilities.  *Id.* at ¶¶ 36-43.  Count Two alleges that Defendant engaged in racial discrimination, in violation of the NJLAD, by failing to provide Plaintiff, who is African-American, with the same accommodation that Defendant had previously provided a Caucasian employee.  *Id.* at ¶¶ 44-50.[9]  Count Three alleges that Defendant violated the ADA by failing to engage in the interactive process and failing to provide Plaintiff with a reasonable accommodation.  *Id.* at ¶¶ 51-64.[10]  On May 12, 2017, Defendant filed the instant Motion for Summary Judgment, which has been fully briefed.  ECF Nos. 25, 34-35.

## III.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v.*

---

[8] Specifically, Verizon removed the action to federal court on the ground that Plaintiff's claims were preempted by § 301 of the Labor Management Relations Act, which "provides for federal jurisdiction over disputes regarding collective bargaining agreements, and mandates the application of uniform federal law to resolve such disputes." *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 228 (3d Cir. 1995); *see also Norton v. Stop & Shop Store # 830*, No. 16-9385, 2017 WL 3610492, at *4 (D.N.J. Aug. 22, 2017).

[9] Improperly numbered in the Second Amended Complaint as ¶¶ 40-46.

[10] Improperly numbered in the Second Amended Complaint as ¶¶ 47-60.

*Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 322. Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson*, 79 F.3d at 1366; *see Gleason v. Norwest Mortg. Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Not every issue of fact is sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Additionally, the nonmoving party cannot rest upon mere allegations; he or she must present actual evidence that creates a genuine issue of material fact. *See* FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 249. In conducting a review of the facts, the nonmoving party is entitled

to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks v. Kyler*, 204 F.3d 102, 105, n.5 (3d Cir. 2000).

## IV.   DISCUSSION

### A.   Disability Discrimination

In the Second Amended Complaint, Plaintiff alleges that Verizon engaged in disability discrimination, in violation of both the ADA and the NJLAD. For the purposes of the instant Motion, the Court will characterize Plaintiff's disability discrimination claims as including a claim for: (i) discriminatory discharge; and (ii) failure to accommodate. Before turning to my analysis of those claims, however, I will briefly discuss the statutory context in which they arise.

#### 1.   *The ADA and the NJLAD*

"Congress enacted the ADA in 1990 in an effort to prevent otherwise qualified individuals from being discriminated against in employment based on a disability." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 579 (3d Cir. 1998) (citing 29 C.F.R. pt. 1630, App. at 347-48 (1997)). The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An employer discriminates against an a qualified individual when, *inter alia*, it fails to

make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

Similarly, the NJLAD "was enacted with the express purpose of protecting civil rights, particularly in the area of employment discrimination, where the NJLAD declares that the opportunity to gain employment without fear of discrimination is a civil right." *Thurston v. Cherry Hill Triplex,* 941 F. Supp. 2d 520, 534 (D.N.J. 2008); *see Fuchilla v. Layman*, 109 N.J. 319, 334 (1988) ("[T]he overarching goal of the [NJLAD] is nothing less than the eradication 'of the cancer of discrimination.'") (quoting *Jackson v. Concord Co.*, 54 N.J. 113, 124 (1969)).  In that regard, New Jersey Supreme Court has explained that the NJLAD is broad remedial legislation, designed to prohibit employers from discriminating against employees with respect to the terms and conditions of their employment on the basis of a protected characteristic, such as race, religion, age, sex, and disability. *See Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 259 (2010) ("We have been vigilant in interpreting the [NJLAD] in accordance with that overarching purpose, and in recognition that it is . . . remedial legislation that was intended to be given a broad and liberal interpretation."); *see also* N.J.S.A. 10:5-12(a) (listing the various protected classes under the NJLAD).  With respect to disability discrimination, the NJLAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. § 10:5–4.1.

### 2. *Discriminatory Discharge*

In Counts One and Three of the Second Amended Complaint, Plaintiff alleges that Verizon terminated his employment due to his disability, in violation of the NJLAD and the ADA, respectively.  Because claims for disability discrimination under the ADA and NJLAD "are analyzed under the same framework," *see Guarneri v. Buckeye Pipe Line Servs*. Co., 205 F. Supp. 3d 606, 614 (D.N.J. 2016); *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 13 (2002), the Court will analyze Plaintiff's discriminatory discharge claims in tandem.

In assessing claims for employment discrimination under the ADA and the NJLAD, courts employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 171 (3d Cir. 2017); *see Viscik*, 173 N.J. at 13-14 ("[O]ur courts have adopted the burden-shifting framework articulated in [*McDonnell Douglas*].").  To establish a *prima facie* case for disability discrimination under the ADA, a plaintiff must demonstrate that:  "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  Similarly, the *prima facie* case for disability discrimination under the NJLAD requires proof that: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job.  *Victor v. State*, 203 N.J. 383, 409 (2010).[11]

---

[11] While the *prima facie* cases for discriminatory discharge under the ADA and the NJLAD differ slightly, they share the identical requirement that the employee be qualified to perform the essential functions of the position.

"Under the burden-shifting framework, if a plaintiff makes out the *prima facie* case, the burden shifts to the employer to show that the adverse employment decision happened for legitimate, non-discriminatory reasons." *Alston*, 679 F. App'x at 171 (citing *McDonnell Douglas*, 411 U.S. at 802); *see Viscik*, 173 N.J. at 14 ("Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."). If the employer demonstrates legitimate, non-discriminatory reasons for the adverse employment decision, "the burden shifts back to the plaintiff to show that the employer's stated reason was pretextual." *Alston*, 679 F. App'x at 171; *Viscik*, 173 N.J. at 14 ("After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination.").

### a.  *Plaintiff is Not a "Qualified Individual"*

The parties first dispute whether Plaintiff has met his burden of establishing that he is a "qualified individual" with a disability. *See Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996) ("[T]he burden is on the employee to prove that he is an 'otherwise qualified' individual."). Courts employ a two-step test in determining whether an employee is a "qualified individual" under the ADA. *Gaul*, 134 F.3d at 580; *see* 29 C.F.R. § Pt. 1630, App. ("The determination of whether an individual with a disability is 'qualified' should be made in two steps."). First, the court must consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." 29 C.F.R. § Pt. 1630, App. Second, the court must determine "whether or not the individual can perform the essential functions of the position held or desired, with or without

reasonable accommodation." *Id.*[12] "The determination of whether an individual with a disability is qualified is to be made at the time of the employment decision." *Id.*

Here, there is no dispute as to the first step of the "qualified individual" analysis. Rather, the issues in the instant case center on the question of whether Plaintiff can perform the essential functions of the OPT position. Specifically, Verizon argues that Plaintiff is not a qualified individual under the ADA, because a CDL was required to perform the essential functions of the OPT position, and Plaintiff's ICD disqualified him from obtaining a CDL. Verizon also contends that the restrictions imposed by Dr. Morris, as a result of Plaintiff's heart condition, preclude Plaintiff from performing the other essential functions of the OPT position, including being able to work in close proximity to electrical lines, working aloft, climbing ladders, operating construction equipment, and descending into manholes.

Plaintiff does not dispute that the OPT Job Description includes a CDL requirement, or that Plaintiff's ICD disqualified him from obtaining a CDL. Rather, Plaintiff maintains that holding a CDL was not an essential job function of the OPT position, because: (1) in practice, Verizon had previously permitted both Plaintiff and other employees to perform the duties of the OPT position without possessing a CDL; (2) after Plaintiff was denied a CDL in 2013, he continued to perform all duties of an OPT, with the exception of driving a CDL-rated vehicle; and (3) minimal driving is required for the OPT position, and, when driving is required, Plaintiff could either operate a non-CDL-rated vehicle, such as a light placer truck, or ride as a passenger in a CDL-rated vehicle, which Plaintiff had done in the past. With respect to the other

---

[12] The regulations note that "[t]he purpose of this second step is to ensure that individuals with disabilities who can perform the essential functions of the position held or desired are not denied employment opportunities because they are not able to perform marginal functions of the position." 29 C.F.R. § Pt. 1630, App.

restrictions imposed upon Plaintiff by Dr. Morris, Plaintiff maintains that he is capable of performing all other functions of the OPT position. To that end, Plaintiff argues that, after failing the 2013 Examination, he performed all duties of an OPT without consequence, with the exception of operating a CDL-rated vehicle. Plaintiff further contends that his doctor cleared him to perform safety sensitive work, as well as to work aloft, in confined spaces, around machinery, and to drive non-CDL-rated vehicles.

Determining whether Plaintiff can perform the essential functions of his job requires the Court to engage in another two-part inquiry. *Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P.*, 257 F.3d 273, 278 (3d Cir. 2001). First, the Court must determine whether Plaintiff can perform the essential functions of the OPT position *without* accommodation. *Id.* at 278. If so, Plaintiff is a "qualified individual" under the ADA. *Id.* If Plaintiff cannot perform the essential functions of the OPT position without accommodation, the Court must then determine whether Plaintiff can perform those functions *with* a reasonable accommodation. *Id.* If Plaintiff cannot perform the essential functions of the OPT position with or without an accommodation, Plaintiff is not a "qualified individual" under the ADA. *Id.*

Under the ADA's implanting regulations, the "essential functions" of a position are defined, generally, as the "fundamental job duties" of the position, as opposed to the "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). The regulations advise courts to consider the following factors in determining whether a particular job function is essential: (1) whether "the reason the position exists is to perform that function"; (2) whether there is a "limited number of employees available among whom the performance of that job function can be distributed"; and (3) whether the function is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R.

§ 1630.2(n)(2)(i)-(iii); *Supinski v. United Parcel Serv., Inc.*, 413 F. App'x 536, 540 (3d Cir. 2011). The regulations further set forth the following non-exhaustive list of evidence that may be considered in determining whether a particular job function is essential:

(i)      The employer's judgment as to which functions are essential;

(ii)     Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)    The amount of time spent on the job performing the function;

(iv)    The consequences of not requiring the incumbent to perform the function;

(v)     The terms of a collective bargaining agreement;

(vi)    The work experience of past incumbents in the job; and/or

(vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)-(vii).

The Third Circuit has "repeatedly recognized [that] 'whether a particular function is essential is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" *Supinski*, 413 F. App'x at 540 (quoting *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998)). Additionally, while the burden is on the employee to demonstrate that he or she is a qualified individual, "the employer 'has the burden of showing a particular job function is an essential function of the job.'" *Supinski*, 413 F. App'x at 540 (quoting *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007)); *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(n) (observing that although "the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards . . . nor to require employers to lower such standards . . . [the employer] will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper."). Accordingly, the Court may only grant summary judgment in Verizon's favor if it concludes that reasonable jurors "could not

but find" that the CDL requirement and other functions exceeding Plaintiff's restrictions were essential functions of the OPT position. *Supinski*, 413 F. App'x at 540.

With respect to Plaintiff's first argument, the Court finds that genuine issues of material fact exist regarding whether the CDL requirement is an essential function of the OPT position. Turning to the three factors set forth in § 1630.2(n)(2), the evidence in the record establishes that OPTs are not hired solely to operate vehicles that require a CDL, or because of their expertise in operating such vehicles. *See* C.F.R. § 1630.2(n)(2)(i) and (iii); *see Skerski*, 257 F.3d at 280 (finding that climbing was not an essential function of the employee's position as an installer technician, where the record established that "installer technicians [were] not hired solely to climb or even because of their climbing expertise.").

Additionally, after considering the evidentiary examples listed in § 1630.2(n)(3), the Court cannot conclude that no reasonable juror could find that maintaining a CDL was not an essential requirement of the CDL position. At the outset, the Court recognizes that some deference is owed to Verizon's judgment that maintaining a CDL is an essential function of the OPT position, and to the written OPT Job Description, which identifies holding a CDL as a job requirement. However, Plaintiff testified that Verizon habitually permitted newly hired OPTs to perform the duties of the position, with the exception of operating CDL-rated vehicles, despite the fact that those OPTs did not immediately obtain CDLs. Rich Dep. 58:1-59:10. Indeed, Plaintiff testified that upon being hired as an OPT, he was immediately "thrown into work," during which time he drove a light placer truck, and that he did not obtain a CDL until approximately a year and a half after he started as an OPT. Rich Dep. 58:18-59:10. Plaintiff further testified that his former partner, Bruce Gillespie, was permitted to work as an OPT for five to six years before he obtained a CDL. Rich Dep. 59:11-24.

Moreover, Plaintiff has presented sufficient evidence regarding the limited amount of time that an OPT must spend operating a CDL-rated vehicle, coupled with the minimal consequences of not being able to operate a CDL-rated vehicle, to raise a question of fact as to whether maintaining a CDL is an essential function of the OPT position. To that end, Plaintiff testified that, prior to losing his CDL, he rarely performed duties that required operating a CDL-rated vehicle, and that, when such a vehicle was needed, he typically was a passenger in the vehicle. Rich Dep. 51:2-52:14. Plaintiff further testified that, after he lost his CDL, he was able to perform all of his prior duties as an OPT, with the exception of driving a CDL-rated truck, and that, when a vehicle was required, he used a light placer. Rich Dep. 50:14-24.

Plaintiff's testimony is corroborated by Douglas L. Walters, who testified that, in his position as Chief Steward for the Union, he is familiar with the duties of the OPT position, and that a "majority of the job functions of an OPT are on-site functions," with "[m]inimal driving . . . required in the OPT position." Walters Aff. at ¶¶ 22-24. Mr. Walters further testified that Verizon has many non-CDL-rated vehicles on hand, and that, as "Plaintiff demonstrated from August 2013 to December 2013, . . . all of [the OPT] job functions could be performed with minimal accommodation such as driving a non-CDL rated vehicle or in the alternative by being a passenger." *Id.* at ¶¶ 25-28. Accordingly, the Court finds that a genuine dispute of material fact exists regarding whether maintaining a CDL is an essential function of the OPT position.

Nonetheless, the Court finds that Plaintiff has failed to meet his burden of demonstrating that he is a qualified individual, because Plaintiff cannot perform several of the other essential functions of the OPT position. In determining whether an employee is a "qualified individual," the ADA states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before

advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see* 29 C.F.R. § 1630.2(n)(3). As a result, the Court will turn to the job duties listed by Verizon in the OPT Job Description.

The OPT Job Description states that OPTs are required, *inter alia*, to: (1) install, remove, or rearrange outside plant facilities, including aerial, underground, submarine, and buried house cables and poles; (2) connect wires and cables to terminals and attach or detach various kinds of hardware to wires, cables, buildings or poles; (3) inspect, repair, and maintain wires, cables, and poles; (4) operate construction type equipment, including winches, chain saws, hydraulic aerial lifts, and large hand tools in placing wires and related materials; (5) work aloft and climb ladders and poles; (6) enter tunnels, trenches, crawl spaces, manholes, and other confined places; and (7) move and lift items such as ladders, tools, air tanks, cable reels, test equipment and other objects weighing up to 100 pounds (collectively, the "Physical Functions"). *See* OPT Job Description. Indeed, Plaintiff does not dispute that performing safety sensitive work, working in close proximity to electrical lines, working aloft, climbing ladders, operating construction equipment, and descending into manholes are essential functions of the OPT position. *See* Pl.'s Opp. to Def.'s Mot. for Summ. J., 15 ("Finally, while he was on restriction, Plaintiff continued to perform the *real essential* functions of the OPT position [without] an issue or problem."). Accordingly, the Court finds that the Physical Functions listed in the OPT Job Description are essential duties of the OPT position.[13]

---

[13] While Plaintiff testified that some of the Physical Functions are only performed on occasion, Rich Dep. 13:7-15:1, 16:22-17:13, Plaintiff fails to argue in his Opposition brief that the Physical Functions are non-essential, and thus, has conceded that argument for the purposes of the instant Motion. *See Aurelio v. Bd. of Educ. of the Borough of Carteret*, No. 06-3146, 2009 WL 1794800, at *6 (D.N.J. June 23, 2009), *aff'd sub nom. Aurelio v. Bd. of Educ. of Borough of Carteret*, 373 F. App'x 263 (3d Cir. 2010) ("Plaintiff fails to address this issue in his opposition brief, and thus the Court grants summary judgment on that argument.").

Having found that the Physical Functions are essential to the OPT position, the Court turns to the question of whether Plaintiff can perform these duties with or without an accommodation. Based on the medical evidence in the record, the Court finds that Plaintiff cannot perform the essential functions of the OPT position. Specifically, in October of 2013, Dr. Morris, after reviewing Plaintiff's 2013 Examination results and being apprised of Plaintiff's ICD and heart condition, imposed the following restrictions on Plaintiff: "No driving company vehicles; No work at heights; No safety-sensitive work; No work with or around dangerous machinery; No confined space entry without a partner present." Def.'s Statement at ¶ 53; Pl.'s Resp. at ¶ 53. Under the restrictions imposed on Plaintiff by Dr. Morris, it is clear that, at a minimum, Plaintiff would not be able to perform the essential duties of operating construction equipment, working aloft or climbing ladders, descending into manholes or other confined spaces, or work in close proximity to electrical lines. No reasonable accommodation may be provided to allow Plaintiff to perform these essential functions.

Indeed, after being read the OPT Job Description verbatim, Plaintiff's own cardiologist, Dr. Gowda, testified that someone with Plaintiff's medical history should not perform the Physical Functions listed therein. Gowda Dep. 42:14-44:2. Additionally, Dr. Gowda testified that a person with Plaintiff's heart condition and with an ICD typically should not climb poles, work on cable wires, work in proximity to electrical equipment, use heavy tools, drive heavy company vehicles carrying heavy equipment, or work in confined spaces like manholes, crawl spaces, trenches, or tunnels. Gowda Dep. 37:11-40:17. Dr. Gowda further testified that an individual with an ICD "cannot work on running motors," because "[t]hey can get electrocuted

and the [ICD] can go off . . . ." Gowda Dep. 37:11-25. Dr. Gowda also testified that, even if a person with cardiomyopathy and an ICD has recovered "back to completely normal," that individual would remain "forever banned" from lifting more than 100 pounds. Gowda Dep. 54:10-55:2. And, significantly, Dr. Gowda agreed with the restrictions that Dr. Morris imposed on Plaintiff. Gowda Dep. 44:16-47:10.

Despite the testimony of Drs. Morris and Gowda, Plaintiff raises three arguments as to why he can perform the Physical Functions of the OPT position. First, Plaintiff argues that, after the ICD was implanted, Dr. Gowda cleared him to perform the Physical Functions of the OPT position. Second, Plaintiff argues that, following the 2013 Examination, but prior to the imposition of Dr. Morris' restrictions, he performed the Physical Functions of the OPT position without consequence. Finally, Plaintiff argues that many of the Physical Functions are not required every day, or can be performed with a partner. The Court finds each of these arguments unpersuasive.

First, the Court finds that Plaintiff's argument that Dr. Gowda cleared him to perform the Physical Functions is without merit. Significantly, neither Dr. Gowda nor any other doctor called by Plaintiff testified that Plaintiff could perform the Physical Functions. Rather, Plaintiff relies solely on his own testimony that, in 2010, Dr. Gowda told Plaintiff that he was "healthy" and "could do anything." Rich Dep. 46:10-18. However, as referenced above, Dr. Gowda's testimony, indicating that an individual with Plaintiff's heart condition and ICD cannot perform the Physical Functions, plainly contradicts that alleged statement. Indeed, the Court notes that Dr. Gowda testified that, prior to being presented with the OPT Job Description during her deposition, Dr. Gowda had not "reviewed or looked at" all of the details of the OPT position, and was unfamiliar with the "[s]pecifics" of Plaintiff's position at Verizon. Gowda Dep. 34:24-

36:13.  Accordingly, the Court finds that Plaintiff's testimony as to Dr. Gowda's alleged, generalized statement is insufficient to create a genuine dispute of fact as to whether Plaintiff can perform the Physical Functions.[14]

Second, Plaintiff's subjective testimony regarding his ability to perform the Physical Functions after the insertion of the ICD does not create a genuine dispute of fact as to Plaintiff's ability to perform the Physical Functions.  Even accepting as true Plaintiffs representations that, while on light duty following the ICD procedure, he performed all duties of an OPT, with the exception of driving CDL-rated vehicles, the mere fact that Plaintiff performed the physical activities without incident to date does not alter the fact that both Plaintiff's own cardiologist and Dr. Morris testified that an individual with an ICD and Plaintiff's medical restrictions should not perform the Physical Functions.  Indeed, a similar argument was rejected by the Third Circuit in *Irving v. Chester Water Auth.*, 439 F. App'x 125 (3d Cir. 2011).  In *Irving*, an employee who had been terminated after sustaining a lower back injury brought suit against his former employer, alleging disability discrimination under the ADA.  439 F. App'x at 126.  The employee's personal physician diagnosed the employee with a permanent disability, and determined that the employee was "completely unable to lift, pull, or push more than fifty pounds and could only occasionally bend, crawl, squat, or operate heavy equipment."  *Id.*  The district court granted

---

[14] While Plaintiff also seeks to rely on two prescriptions from Dr. Gowda, issued on October 9, 2013 and December 18, 2013, respectively, which state generally that Plaintiff "has no driving restrictions," "can work aloft," "can do safety sensitive work," "can work around machinery," and "can work in confined areas without assistance," Dr. Gowda admitted during her January 19, 2017 deposition that, prior to reading the OPT Job Description, she was unaware of the specifics of Plaintiff's position. Gowda Dep. 34:24-36:13.  And, once apprised of the essential duties of the OPT position, including the Physical Functions, Dr. Gowda testified that someone with Plaintiff's medical history should not perform the Physical Functions, and agreed with Dr. Morris' restrictions.  Gowda Dep. 42:14-44:2; 44:16-47:10.  Accordingly, the Court finds that the statements in the prescriptions are insufficient to create a genuine dispute of fact as to Plaintiff's ability to perform the Physical Functions.

summary judgment in favor of the employer, finding that the employee failed to raise a genuine dispute of fact as to whether he could perform the essential functions of his position as a repairman. *Id.*

On appeal, the employee, relying on his own deposition testimony, argued that he was "capable of performing the essential functions of the job since he performed his regular responsibilities while on light duty following the initial injury." *Id.* at 126–27. The Third Circuit rejected the employee's argument, holding that the employee's "self-serving deposition testimony [was] insufficient to raise a genuine issue of material fact." *Id.* at 127. Specifically, after finding that lifting, pulling, and pushing more than fifty pounds, as well as frequent squatting and bending, were essential functions of the position, the court observed that, outside of Plaintiff's testimony, no evidence in the record established that Plaintiff could perform those functions, even with accommodations. *Id.* Similarly, here, Plaintiff's testimony regarding his ability to perform the Physical Functions is without the support of any medical evidence in the record, and, in fact, is directly contradicted by Plaintiff's cardiologist and Dr. Morris. Moreover, the Court notes that, throughout the pendency of this action, Plaintiff had the opportunity to elicit testimony from either Dr. Gowda, or another doctor, as to his ability to perform the Physical Functions. He failed to do so. Accordingly, the Court finds that Plaintiff's subjective testimony regarding his ability to perform the Physical Functions is insufficient to create a genuine dispute of material fact.

Finally, the Court finds Plaintiff's argument that he could have had another OPT assist him in performing safety sensitive work, due to the fact that OPTs are typically accompanied by other OPTs when they perform field-work, unavailing. In that regard, it is well-established within the Third Circuit that an employer is not required to accommodate an employee's

limitations "by removing essential functions of the job or shifting them to other employees." *Irving*, 439 F. App'x at 127. Thus, Plaintiff's arguments as to the ability to have a partner assist him in performing the Physical Functions are rejected.

The Court also finds that Plaintiff has failed to meet his burden of establishing that he could have performed the Physical Functions with a reasonable accommodation. Under the ADA, an "employer discriminates against a qualified individual when it does 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 608 (3d Cir. 2006) (quoting 42 U.S.C. § 12112(b)(5)(A)). A "reasonable accommodation" refers to measure such "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). The employee bears the initial burden of making a *prima facie* showing that his or her proposed accommodation was unreasonable. *Turner*, 440 F.3d at 614; *Gaul*, 134 F.3d at 580. If the employee meets his or her burden, the burden shifts to the employer "to prove, as an affirmative defense, that the accommodations requested by [the employee] are unreasonable, or would cause an undue hardship on the employer." *Turner*, 440 F.3d at 614.

Here, with respect to Plaintiff's disability discharge claim, Plaintiff has failed to meet his burden of demonstrating that he could perform the essential functions of the OPT position with an accommodation that is reasonable. Significantly, Plaintiff's argument as to Verizon's failure to provide a reasonable accommodation is limited to Verizon's denial of his request to perform the OPT position without a CDL. However, in light of this Court's findings that the Physical

Functions were essential functions of the OPT position, and that Plaintiff could not perform the Physical Functions without an accommodation, Plaintiff bears the burden of demonstrating not only that Verizon denied him a reasonable accommodation with respect to the CDL requirement, but also that Verizon denied Plaintiff a reasonable accommodation with respect to the Physical Functions.  And, in that regard, Plaintiff has neither alleged nor explained what actual accommodations were lacking with respect to his ability to perform the Physical Functions. Accordingly, because Plaintiff has failed to establish any accommodations that would have allowed him to perform the Physical Functions, or to advance any evidence to show that Verizon in fact denied Plaintiff an accommodation with respect to the Physical Functions, the Court cannot find that Plaintiff could have performed the Physical Functions with an accommodation. *See Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 70 (3d Cir. 1996) (affirming district court's dismissal of the employee's failure to accommodate claim, where the employee "advanced no Rule 56 evidence depicting how [the employer] failed to accommodate him as required by the Act.").

Accordingly, because Plaintiff could not have performed the Physical Functions, with or without an accommodation, the Court finds that Plaintiff is not a "qualified individual" under the ADA or the NJLAD, and thus, that Plaintiff cannot establish the *prima facie* case for discriminatory discharge.

> b.      *Verizon Had a Legitimate, Nondiscriminatory Reason for Plaintiff's Termination*

Even if Plaintiff could demonstrate a *prima facie* case for discriminatory discharge, his claim would still fail, because Verizon has presented a legitimate, nondiscriminatory reason for Plaintiff's discharge, and Plaintiff cannot demonstrate that Verizon's proffered reason was pretextual.  To that end, as this Court has already stated, under the *McDonnell Douglas* burden-

shifting framework, once an employee meets his or her initial burden of establishing a *prima facie* case of discrimination, the burden of production shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Parker v. Verizon Pennsylvania, Inc.*, 309 F. App'x 551, 555 (3d Cir. 2009). In order to satisfy its burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action, the employer "need not prove that the tendered reason *actually motivated* its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Rather, the employer satisfies its "relatively light" burden of production "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.*

Here, Verizon met its burden of demonstrating a legitimate, nondiscriminatory reason for Plaintiff's discharge by producing evidence that Plaintiff was terminated for misrepresenting his health condition on the Examination Reports, in violation of Verizon's Code of Conduct. Specifically, it is undisputed that although Plaintiff was diagnosed with cardiomyopathy and had an ICD implanted in his chest in 2010, Def.'s Statement at ¶ 22; Pl.'s Resp. at ¶ 22, Plaintiff answered "No" to the following three questions on the Examination Reports, certifying on each Report that his answers were "complete and true": (1) "Any illness or injury in the last five years"; (2) Heart disease or heart attack; *other cardiovascular condition*"; (3) Heart surgery (valve replacement/bypass, angioplasty, pacemaker." 2012 Medical Examination Report; 2013 Medical Examination Report. Furthermore, Verizon's Code of Conduct requires, *inter alia*, that employees "create accurate records," and provides that "Verizon does not tolerate the falsification of records." Def.'s Statement at ¶ 71; Pl.'s Resp. at ¶ 71. Accordingly, Verizon has

met its "relatively light" burden of establishing that it terminated Plaintiff for a legitimate, nondiscriminatory reason by introducing evidence that it discharged Plaintiff after discovering that Plaintiff misrepresented his health condition on the Examination Reports, in violation of Verizon's Code of Conduct. *See Parker*, 309 F. App'x at 555–56 ("Verizon met its burden of demonstrating a legitimate, nondiscriminatory justification for [the employee's] discharge with evidence that [the employee] was terminated for misrepresenting his health status in violation of Verizon's Code of Business Conduct.").

*c.    Plaintiff has not Demonstrated Pretext*

Because Verizon met its burden of demonstrating a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, the burden shifts back to Plaintiff to "prove by a preponderance of the evidence that [Verizon's] proffered reason was a pretext for discrimination." *Parker*, 309 F. App'x at 555. At the summary judgment stage, an employee may meet his or her burden of demonstrating pretext "by providing evidence that would allow a fact finder reasonably to '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003) (quoting *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999)). The Third Circuit has observed that, in order to discredit the employer's articulated reason for termination:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (internal citations and quotation marks omitted); *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

Alternatively, the employee may also survive summary judgment by "pointing to evidence in the record which 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Jones*, 198 F.3d at 413 (quoting *Fuentes*, 32 F.3d at 764). "For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).

Here, Plaintiff raises two arguments as to why Verizon's stated reason for discharging Plaintiff was pretextual. First, Plaintiff maintains that he did not intentionally misrepresent his health condition on the Examination Reports, but instead answered those questions based on his understanding of his health condition, as conveyed to him by Dr. Gowda. Second, Plaintiff argues that his discharge was a retaliatory act taken by Verizon after Plaintiff filed grievances relating to his requests for accommodations. Neither argument is sufficient to demonstrate pretext.

First, Plaintiff attempts to discredit Verizon's reason for discharging him by arguing that he did not intentionally misrepresent his health condition on the Examination Reports, but answered those questions based on his understanding of his condition, as conveyed to him by Dr. Gowda.[15] However, "the question is not whether Verizon's decision was wrong or mistaken but

---

[15] Specifically, Plaintiff argues that he answered "No" to question one (whether he had an illness or disease in the last five years), because Dr. Gowda never explained Plaintiff's heart condition

whether Verizon acted with discriminatory animus." *Parker*, 309 F. App'x at 557; *see Ball v. Einstein Cmty. Health Assocs., Inc.*, 514 F. App'x 196, 199 (3d Cir. 2013) ("The fact that an employer made a poor or unwise decision does not make that decision discriminatory."); *Watson v. Se. Pennsylvania Transp. Auth.*, 207 F.3d 207, 222 (3d Cir. 2000) (recognizing that, so long as a discriminatory animus is not shown, an employer is permitted to "take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct."). Indeed, the Third Circuit has recognized that "an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995). "Evidence undermining an employer's proffered legitimate reasons therefore must be sufficient to 'support an inference that the employer did not act for its stated reasons.'" *Ball*, 514 F. App'x at 199–200 (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995)). Here, even assuming Plaintiff answered the questions based on his honestly held beliefs regarding his health condition, the fact that Plaintiff did not intentionally misrepresent his condition, without more, does not support an inference that Verizon did not terminate Plaintiff based on his failure to accurately represent his condition on the Examination Reports. *See Sempier*, 45 F.3d at 731 (3d Cir. 1995) (noting that the "inquiry into pretext centers upon the employer's beliefs and not the employee's own perceptions."). Accordingly, Plaintiff's purported justification for misrepresenting his health condition on the Examination Reports is insufficient to demonstrate pretext.

---

as an illness. Plaintiff argues that he answered "No" to the question two (whether he had heart disease, a heart attack, or other cardiovascular condition), because Dr. Gowda never referred to Plaintiff's condition as a disease, and because Dr. Gowda told Plaintiff that his condition had improved. Plaintiff argues that he answered "No" to question three (whether he had heart surgery), because Dr. Gowda never referred to the insertion of the ICD as a "surgery," characterizing it instead as a "procedure."

Second, Plaintiff argues that this Court may draw an inference of pretext due to the fact that Plaintiff was only terminated after the Union filed two separate grievances concerning Plaintiff's request for an accommodation. In that regard, Plaintiff argues that despite having knowledge of Plaintiff's answers on the Examination Reports as of October 17, 2013, Verizon did not terminate Plaintiff until May 7, 2014, after he had filed his second grievance. Distilled to its essence, Plaintiff's argument is one of retaliation based on temporal proximity.

At the outset, the Court notes that retaliation is a distinct claim under the ADA, which requires a plaintiff to demonstrate: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *Taylor-Bray v. Delaware Dep't of Servs. for Children, Youth & their Families*, 627 F. App'x 79, 84 (3d Cir. 2015). In the Second Amended Complaint, however, Plaintiff fails to assert a claim alleging that Verizon terminated Plaintiff in retaliation for filing grievances. Rather, Plaintiff raises the issue of retaliation for the first time in his opposition to Defendant's Motion for Summary Judgment. However, because "[a] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment,'" *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008), it follows that Plaintiff's theory of retaliation cannot serve as the basis for this Court to find that Plaintiff has demonstrated pretext.

Moreover, even assuming Plaintiff can proceed on a retaliation theory of pretext alone, without asserting a direct claim for retaliation, Plaintiff has not proffered sufficient evidence of retaliation for a reasonable factfinder to conclude that Verizon's stated reason for Plaintiff's termination was pretextual. "To establish the requisite causal connection [to state a claim for

retaliation] a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). In this case, Plaintiff points solely to the temporal proximity of his termination after filing the second grievance to establish his theory of retaliation.

The Third Circuit has advised that "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse*, 126 F.3d at 503 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)). Rather, "[o]nly when the facts are 'unusually suggestive of retaliatory motive' may temporal proximity alone support an inference of causation." *Escanio v. United Parcel Serv.*, 538 F. App'x 195, 200 (3d Cir. 2013); *see Krouse*, 126 F.3d at 503 ("Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Accordingly, courts within this Circuit have routinely dismissed claims asserting that an employer's stated reason for an adverse employment action was pretextual, where such claims are based solely on the temporal proximity of the adverse employment action to the filing of a grievance or complaint. *See, e.g.*, *Flax v. Delaware*, 329 F. App'x 360, 365 (3d Cir. 2009) (affirming summary judgment of an employee's ADA retaliation claim, where the employee failed to proffer any evidence, other than temporal proximity, to demonstrate a causal link between the adverse employment action and his filing of a grievance); *Sanchez v. Tricorp Amusements, Inc.*, No. 08-4554, 2010 WL 4923354, at *14 (D.N.J. Nov. 29, 2010) (finding that the employee failed to establish that the employer's "proffered explanation for demoting and terminating her is false or pretextual," where the

employee relied solely on the temporal proximity of her termination to her filing of a discrimination complaint); *Walker v. Pepsi-Cola Bottling Co.*, No. 98-225, 2000 WL 1251906, at *20 (D. Del. Aug. 10, 2000) (finding that the employee's retaliation theory of was insufficient to demonstrate pretext, where, "[a]s evidence of causation, [the employee] relie[d] only on the temporal proximity of his July 7th termination to the filing of his disability-related grievances on June 20th.").

For example, in *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751 (3d Cir. 2004), the Third Circuit affirmed the district court's finding that no reasonable jury could conclude that the employee's discharge was causally related to his filing of a request for an accommodation, as required to support the employee's ADA retaliation claim. *Id.* at 761. In *Williams*, the employee attempted to establish retaliation by relying solely on the fact that he was terminated two months after filing a request for an accommodation. *Id.* at 760. The Third Circuit distinguished the allegations in *Williams* from a previous case in which it had held that two days between protected employee activity and an adverse employment action was sufficient to establish causation, noting that, "[i]n cases like this one, 'where the temporal proximity is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test.'" *Id.* (quoting *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003)). And, because the employee "failed to proffer any evidence of retaliation other than the not unduly suggestive temporal relationship between his request for an accommodation and his termination," the Third Circuit affirmed the dismissal of the employee's ADA retaliation claim.

Similarly, in *Escanio*, the Third Circuit affirmed the district court's decision granting summary judgment of a retaliation claim based on temporal proximity alone, finding that the employee failed to show "a sufficient causal link between the protected activity and his

discharge." 538 F. App'x at 200. In that case, the employee argued that a retaliatory motive could be inferred from the fact that he was discharged within a month of filing two grievances concerning alleged mistreatment at work. *Id.* at 199. In finding that the employee failed to state a claim for retaliation, the Third Circuit noted that "the mere temporal proximity of [the employee's] termination to those complaints [was] insufficient, on its own, to demonstrate the required causal nexus." *Id.* at 200. Additionally, the court found that the facts of that case were not "unusually suggestive" of a retaliatory motive, because, while it was true that the employee was discharged shortly after filing two grievances, it was equally true that the employee had history of poor performance, and that, directly before his termination, the employer observed the employee "repeatedly taking extended lunch breaks and *falsifying time cards . . . .*" *Id.*

As in *Williams* and *Escanio*, here, the Court cannot find that Plaintiff has proffered sufficient evidence of retaliation for a reasonable jury to conclude that Verizon's legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual. As evidence of causation, Plaintiff relies only on the temporal proximity of his May 7, 2014 discharge to the filing of his second accommodation-related grievance in October or November of 2013. Pl.'s Counterstatement at ¶ 177; Walters Aff. at ¶ 19. However, as stated above, the mere fact that Plaintiff was terminated relatively shortly after filing a grievance is generally insufficient to demonstrate the requisite casual link to prove a retaliatory motive, *Krouse*, 126 F.3d at 503, and the facts of this case are not "unusually suggestive" of a retaliatory motive. To that end, Plaintiff was fired approximately six months after filing the second grievance, which, under the Third Circuit's guidance in *Williams*, is not unduly suggestive of a retaliatory motive. Additionally, Plaintiff has failed to proffer any other evidence demonstrating that Verizon terminated him *because* he filed grievances regarding his requests for accommodations. Indeed, the record

establishes that Verizon only terminated after concluding its investigation, which revealed that Plaintiff had falsified answers on the Examination Reports. *See* Investigative Report. In light of these facts, the Court finds that Plaintiff has not established that Verizon's proffered explanation for terminating Plaintiff was pretextual, and thus, the Court will grant summary judgment in favor of Verizon on Plaintiff's discriminatory discharge claims.

### 2.  *Failure to Accommodate*

In addition to asserting claims for discriminatory discharge, Counts One and Three of the Complaint also assert claims for failure to accommodate. Specifically, Plaintiff alleges that Verizon failed to accommodate him by: (1) failing to provide Plaintiff a reasonable accommodation that would allow him to perform the OPT position; (2) failing to transfer Plaintiff to another position that he was qualified to perform; and (3) failing to engage in the interactive process.

The ADA[16] "specifically provides that an employer 'discriminates' against a qualified individual with a disability when the employer does 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" *Williams*, 380 F.3d at 761 (quoting 42 U.S.C. § 12112(b)(5)(A)). "'Reasonable accommodation' further 'includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith,' under what has been termed a duty to engage in

---

[16] The requirements for a failure to accommodate claim under the NJLAD have been interpreted in accordance with the standards governing the ADA. *Tynan v. Vicinage 13 of Superior Cour*t, 351 N.J. Super. 385, 397 (App. Div.2002); *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 n. 12 (3d Cir.2006). Accordingly, the Court will analyze Plaintiff's claims for failure to accommodate under the ADA and the NJLAD jointly.

the 'interactive process.'" *Williams*, 380 F.3d at 761 (quoting *Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997)).

As with his discriminatory discharge claim, Plaintiff must first establish a *prima facie* case of discrimination under the ADA in order to recover for an alleged failure to accommodate. Additionally, to survive summary judgment on his ADA failure to accommodate claim, Plaintiff must establish that: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).

At the outset, the Court notes that Plaintiff's failure to establish a *prima facie* case for disability discrimination, due to his inability to perform the Physical Functions, is fatal to his failure to accommodate claim. Additionally, as described, *supra*, Plaintiff's argument regarding Verizon's failure to provide a reasonable accommodation that would allow him to perform the essential functions of the OPT position is limited to his request to have the CDL requirement removed from his job description. To that end, Plaintiff has not alleged that he can perform the Physical Functions with a reasonable accommodation, or proffered any evidence that would allow a reasonable jury to conclude that Verizon denied Plaintiff a reasonable accommodation that would permit him to perform the Physical Functions.

Next, Plaintiff's argument that Verizon could have accommodated him by transferring him to the Facilities Technician position is unavailing. While "[a]n employer's obligation to provide a reasonable accommodation does not require the employer to create a new job," an employer "may be required to transfer an employee to an existing position." *Donahue v. Consol.*

*Rail Corp.*, 224 F.3d 226, 230 (3d Cir. 2000). A plaintiff alleging a failure to accommodate

claim on the ground that he or she should have been transferred to a different position bears the

burden of establishing "'that there were vacant, funded positions whose essential duties he was

capable of performing, with or without reasonable accommodation, and that these positions were

at an equivalent level or position as [his former job]." *Gaul*, 134 F.3d at 580 (quoting *Shiring*,

90 F.3d at 832); *Gera v. Cty. of Schuylkill*, 617 F. App'x 144, 147 (3d Cir. 2015). Here, while

Plaintiff argues generally in his Opposition brief that he was qualified to perform the functions of

a Facilities Technician, Plaintiff has not proffered any evidence, or otherwise argued that there

were vacant, funded Facilities Technician positions available at Verizon. Nor has Plaintiff

argued that the Facilities Technician position is at an equivalent level or position as his former

job as an OPT. In fact, Plaintiff testified during his deposition that the Facilities Technicain

position requires a person to work aloft, drive company vehicles, and work in confined spaces,

and that, under the restrictions imposed on Plaintiff by Dr. Morris, Plaintiff would not be able to

perform the Facilities Technician position. Rich Dep. 70:2-12. Accordingly, Plaintiff has failed

to meet his burden of establishing a failure to accommodate claim on that basis.

Finally, the Court finds Plaintiff cannot establish a failure to accommodate claim on the

ground that Verizon failed to engage in the interactive process. While the ADA itself does not

refer to an "interactive process," *Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 359 (3d Cir. 2002),

the ADA's implementing regulations "provide that in order '[t]o determine the appropriate

reasonable accommodation it may be necessary for the [employer] to initiate an informal,

interactive process with the [employee] in need of accommodation.'" *Conneen v. MBNA Am.

Bank, N.A.*, 334 F.3d 318, 329 (3d Cir. 2003) (quoting 29 C.F.R. § 1630.2(o)(3)). The

interactive process "should identify the precise limitations resulting from the disability and the

potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999).

To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate that:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Taylor*, 184 F.3d at 319–20. However, "[t]he interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." *Id.* at 317. Rather, "[a]ll the interactive process requires is that employers make a good-faith effort to seek accommodations." *Id.*

Here, Plaintiff argues that Verizon failed to engage in the interactive process with Plaintiff by failing to grant Plaintiff's request for a permanent accommodation removing the CDL requirement from his job description, and by failing to investigate whether Plaintiff could work as a Facilities Technician. However, it is well-established that the interactive process requirement does not dispose of an employee's burden to demonstrate that he or she could have performed the essential functions of a position with a reasonable accommodation. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 193 (3d Cir. 2009) ("[I]f the employee 'is not a 'qualified individual' under the ADA, ... [the employer's] alleged failure to investigate into reasonable accommodation is unimportant.'") (quoting *Gaul*, 134 F.3d at 581)); *Gera*, 617 F. App'x at 147 ("Because [the employee] failed to demonstrate that he is a qualified individual, his argument that the defendant violated the ADA by not engaging in an interactive process also

47

fails."). Here, as the Court has already found, Plaintiff has not established that he is a "qualified individual," because he failed proffer evidence sufficient for a reasonable jury to find that he is capable of performing the Physical Functions of the OPT position – or even the Facilities Technician position – with or without a reasonable accommodation.[17] Accordingly, Plaintiff's interactive process claim necessarily also fails, and the Court will grant summary judgment in Verizon's favor as to Plaintiff's failure to accommodate claim.

## B. Racial Discrimination

---

[17] Furthermore, even if Plaintiff were a qualified employee, the Court notes that it would likely find that Verizon did in fact adequately engage in the interactive process in this case. The Third Circuit has explained that "[a]n employer may satisfy its obligation to participate in the interactive process in any number of ways, *e.g.*, by exchanging letters with the employee to identify and describe vacant positions." *Whelan v. Teledyne Metalworking Prod.*, 226 F. App'x 141, 147 (3d Cir. 2007). Additionally, the interactive process does not require an employer to provide the employee with his or her preferred accommodation; rather, the interactive process is satisfied by providing a reasonable accommodation. *Khoury v. Sec'y United States Army*, 677 F. App'x 735, 737 n. 10 (3d Cir. 2017); *see Diaz v. City of Philadelphia*, 565 F. App'x 102, 106 (3d Cir. 2014) ("The ADA does not . . . require an employer to provide a disabled employee with the accommodation of her choosing."); *see also Boshko v. Bently Nevada, LLC*, No. 07-4624, 2009 WL 223417, at *5 (D.N.J. Jan. 28, 2009) (observing that, to satisfy the interactive process, "the proposed accommodation need only be reasonable, and need not be the employee's preferred accommodation."). Here, the undisputed facts in the record demonstrate that, in accordance with the MR-LOAPA, while Plaintiff was on the MRP, Verizon searched for alternative positions that Plaintiff could perform, and notified Plaintiff of open positions as a Fiber Customer Support Analyst, Operations Clerk, Repair Service Clerk, and Network Technician. Def.'s Statement at ¶ 58; Pl.'s Resp. at ¶ 58. That Plaintiff failed to test qualify for the vacant positions, without any additional evidence or allegation by Plaintiff demonstrating that Verizon acted in bad faith by identifying those vacancies, is insufficient to find that Verizon failed to engage in the interactive process. Additionally, the Third Circuit has previously found that providing a period of light duty work or unpaid leave, in and of itself, may constitute a reasonable accommodation. *See Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 585 (3d Cir. 2004); *see, e.g.*, *Moore v. Cvs Rx Servs., Inc.*, 660 F. App'x 149, 152 (3d Cir. 2016) (finding that an employer reasonably accommodated employee by providing a period of unpaid leave). Here, the record demonstrates that, after failing the 2013 Examination, Plaintiff was provided with a period light duty work at full pay, followed by a period of unpaid leave with benefits. Under these circumstances, the Court notes, without reaching the issue, that Verizon likely met its burden of engaging in the interactive process.

Count Two of the Second Amended Complaint asserts claims for race discrimination in violation of the NJLAD.  Specifically, in Count Two, Plaintiff, who is African American, alleges that Verizon committed race discrimination by denying him his preferred accommodation, despite having previously transferred a Caucasian employee with a defibrillator to the Facilities Technician position.  Verizon moves for summary judgment of Plaintiff's race discrimination claim, arguing that Plaintiff has failed to meet his burden of establishing a *prima facie* case of race discrimination.

Racial discrimination claims brought under the NJLAD are analyzed under the now already familiar burden shifting analysis of *McDonnell Douglas*.  *Rodriguez v. Nat'l R.R. Passenger Corp.*, 532 F. App'x 152, 153 (3d Cir. 2013); *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 546 (2013) ("All LAD claims are evaluated in accordance with the [*McDonnell Douglas*] burden-shifting mechanism.").  To state a *prima facie* case of racial discrimination, a plaintiff must demonstrate that he or she:  (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action[18]; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination. *Davis v. City of Newark*, 285 F. App'x 899, 903 (3d Cir. 2008); *see Rodriguez*, 532 F. App'x at 153.  "Once the plaintiff establishes a *prima facie* case, the burden of production then shifts to

---

[18] In order to establish a claim of racial discrimination, an adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'"  *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296–97 (3d Cir. 1997), ab*rogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (quoting 42 U.S.C. § 2000e–2(a)(1) and (2)). Not every "insult, slight, or unpleasantness gives rise to a valid [race discrimination] claim."  *Id*. at 1297.

the [employer], who must articulate a legitimate, nondiscriminatory reason for its actions."
*Davis*, 285 F. App'x at 903. If the employer meets its burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason for the adverse employment action was pretextual. *Id.*

Here, Verizon concedes that Plaintiff is a member of a protected class, and that an adverse employment action was taken. The instant dispute thus centers on the second and fourth factors of Plaintiff's *prima facie* case for race discrimination. To that end, Verizon contends that Plaintiff is not a "qualified individual," and that Plaintiff has not proffered sufficient evidence for a reasonable jury to infer racially discriminatory intent. The Court agrees.

As to the second factor, the Court has already found that Plaintiff was not a "qualified individual" at the time of his termination, due to his inability to perform the essential functions of the OPT positon. Accordingly, Plaintiff cannot make out the *prima facie* case for race discrimination. *See Hubbard v. Springfield Bd. of Educ.*, 80 F. App'x 757, 759 (3d Cir. 2003) (affirming district court's dismissal of the employee's race discrimination claim, because the employee failed to demonstrate under the second prong of his *prima facie* case that he was qualified to perform the essential functions of his position).

Even if Plaintiff were qualified to perform the essential functions of the OPT position, Plaintiff cannot meet the fourth element of the *prima facie* case for race discrimination, because he has not proffered sufficient evidence giving rise to an inference of racial discrimination. An inference of discrimination may be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by supervisors suggesting racial animus.

*See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002); *see Golod v. Bank of Am. Corp.*, 403 Fed. Appx. 699, 703 n. 2 (3d Cir. 2010); *Vega v. City of Brunswick*, 171 F. App'x 930, 935–36 (3d Cir. 2006) ("[W]here a plaintiff claims . . . racial discrimination in employment, the plaintiff may present evidence of the treatment of employees of other races as a basis for the trier of fact to infer that the differing treatment meted out to the plaintiff was based on race.") (citation omitted). Here, Plaintiff argues that a reasonable juror could draw an inference of racial discrimination based on: (1) comparator evidence, demonstrating that while Verizon did not permit Plaintiff to transfer to the Facilities Technician position, Verizon had previously transferred a Caucasian employee with a defibrillator to the Facilities Technician position; and (2) previous incidents at Verizon demonstrating a racially hostile environment.

First, the Court finds that Plaintiff has presented insufficient comparator evidence to support a claim of racial discrimination. "An inference of discrimination may arise if similarly situated employees of a different race received more lenient treatment than that afforded plaintiff." *Ewell v. NBA Properties, Inc.*, 94 F. Supp. 3d 612, 624 (D.N.J. 2015). To survive summary judgment, a plaintiff must present comparator evidence sufficient to prove that he or she is "similarly situated" to his or her comparators, and that these employees have been treated differently or favorably by their employer. *See Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003); *Kay Jewelers*, 142 F.3d at 645. "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). The "determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.*; *Ewell*, 94 F. Supp. 3d at 624.

Here, Plaintiff has failed to proffer evidence from which a reasonable jury could conclude that the comparator employee is similarly situated to the Plaintiff in all relevant respects. To that end, the Second Amended Complaint only alleges generally that "[a] Caucasian male was previously given an accommodation when he had a defibrillator." Second Am. Compl. ¶ 42. To support that allegation Plaintiff relies on his own deposition, in which he testified that Mr. Walters had told him that Verizon had previously accommodated a Caucasian OPT with a defibrillator by transferring him to the Facilities Technician position.[19] Rich Dep. 54:6-56:19. Plaintiff also proffers an email from Mr. LaMarsh to Mr. DiVito, wherein LaMarsh asked if it would be possible to move Plaintiff to the Facilities Technician position, noting that "an OPT with a similar condition was accommodated with a title change back to a FT over at Howell." Pl.'s Opp. to Def.'s Mot. for Summ. J., Ex. 12. However, these generalized statements provide insufficient comparator evidence for a reasonable jury to conclude that the prior non-minority employee was "similarly situated" to Plaintiff in all relevant respects, as required to infer racial discrimination on the basis of comparator evidence. Significantly, Plaintiff has failed to produce any admissible evidence regarding the precise medical condition of the alleged comparator, the accommodation requested by the comparator, or that the comparator had the same supervisors as Plaintiff. And, with respect to the email sent by Mr. LaMarsh, Mr. LaMarsh testified that he had

---

[19] Verizon argues, and the Court agrees, that Plaintiff's testimony as to Mr. Walter's statement constitutes hearsay. Nonetheless, "the rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only 'explain the admissible form that is anticipated.'" *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238–39 (3d Cir. 2016) (quotations omitted) (emphasis in original). While the Court questions whether the hearsay statement in this case is capable of being admissible at trial, it need not resolve that issue, because, even considering that statement, Plaintiff has not proffered sufficient comparator evidence to support a claim of racial discrimination.

no firsthand knowledge of the alleged comparator, and simply was relying on what Plaintiff had told him – i.e., the same hearsay discussed above.[20]  Absent specific comparator evidence sufficient to find that Plaintiff and the alleged non-minority employees were "similarly situated," Plaintiff's allegations that a prior Caucasian employee was transferred to the Facilities Technician position are too general to provide "the mortar with which to build a case of [racial] discrimination."  *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).

Second, Plaintiff's evidence of racial hostility is insufficient to raise an inference that the adverse employment actions taken by Verizon were the result racial discrimination.[21]  In his Opposition brief, Plaintiff cites to several incidents that occurred at Verizon, alleging that those incidents support an inference of racial animus.  On one occasion in 2008, before Plaintiff began working in the garage, investigators from the Robbinsville Township Police Department were called to the garage after a noose was found hanging therein.  Pl.'s Counterstatement at ¶¶ 13-17.  Attached to the noose was a sign that contained derogatory words towards the African American race.  Pl.'s Counterstatement at ¶ 15.  Plaintiff also testified that, in 2011, he was informed by an

---

[20] Indeed, Mr. LaMarsh's testimony in this case further indicates that the email cannot serve as comparator evidence sufficient to support a claim of disparate treatment.  To that end, during his deposition, Mr. LaMarsh testified that the information in the email regarding a prior employee who had been transferred to the Facilities Technician position was based on what Plaintiff had told him.  LaMarsh Dep. 31:17-33:9.  Specifically, when asked if he knew the individual referenced in the email, Mr. LaMarsh testified that he "would not – if I knew who the OPT was, I would have named him in this e-mail, so I did not know the technician he was referring to.  I wasn't even sure if it was even true, which is why I sent that e-mail to Tony DiVito."  LaMarsh Dep. 33:5-9.  Indeed, when asked specifically whether he knew of "an individual who was accommodated by being moved to the [Facilities Technician] position because of a similar condition or medical condition," Mr. LaMarsh responded, "Not to my knowledge, no."  LaMarsh Dep. 34:5-11.
[21] The Court notes that Plaintiff failed to raise any of these incidents in the Second Amended Complaint, referencing them for the first time in his Opposition brief.

African American co-employee that racial epithets were written on the inside door panel of the co-employee's Verizon truck. Rich Dep. 85:10-86:9; Pl.'s Counterstatement at ¶¶ 19-21.

Plaintiff's argument that these incidents are sufficient to demonstrate a *prima facie* case of racial discrimination is unavailing. Significantly, Plaintiff has not alleged a causal connection between these incidents and either Verizon's decision to terminate Plaintiff or to deny Plaintiff's preferred accommodation of a transfer to the Facilities Technician position. Indeed, Plaintiff has not alleged that either incident was committed by a relevant decisionmaker at Verizon, or stated a connection between those incidents and himself. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision. ."). To the contrary, the record establishes that these racial incidents occurred years before the adverse employment action in this case, and that Plaintiff lacks firsthand knowledge of the incidents, only learning of of them through intermediaries. *See Ade v. KidsPeace Corp.*, 401 F. App'x 697, 704 (3d Cir. 2010) (finding that a reasonable jury could not infer racial discrimination from two discriminatory remarks referenced by the plaintiff, where the remarks were "made nearly two years prior to [the plaintiff's] termination, and . . . [one of the declarants] never maintained any supervisory authority over [the plaintiff] and was not responsible for the decision to terminate him."); *Davis v. Cleary*, No. 09-0925, 2011 WL 4435697, at *4 (D.N.J. Sept. 22, 2011) (finding that several "crude and unprofessional comments" by non-decisionmakers were insufficient to support "an inference of racial discrimination, particularly considering the incidents in question occurred more than a year before the alleged discrimination and did not involve . . . the relevant decisionmakers . . . ."). Accordingly, absent any causal relation between those incidents and

Plaintiff's termination, or any allegation that those racially charged events were initiated by someone with supervisory authority over Plaintiff, the racial incidents referenced in Plaintiff's brief are insufficient to support a claim of racial discrimination.

In sum, because Plaintiff is not qualified for the OPT position, and has not proffered evidence giving rise to an inference of racial discrimination, the Court finds that Plaintiff has failed to establish a *prima facie* case for race discrimination. And, even if Plaintiff had established a *prima facie*, for the reasons discussed at length in the Court's analysis of Plaintiff's disability discrimination claims, Verizon articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, and Plaintiff is unable to demonstrate pretext. Accordingly, the Court grants summary judgment in favor of Verizon on Plaintiff's race discrimination claims.

## V.    CONCLUSION

For the foregoing reasons, Verizon's Motion for Summary Judgment is GRANTED.

Dated:  December 11, 2017                              /s/ Freda L. Wolfson
                                                       Hon. Freda L. Wolfson
                                                       United States District Judge